J-S22002-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MATHEW STEFAN MORALES, | |
| Appellant | No. 833 MDA 2016 |

Appeal from the Judgment of Sentence February 16, 2016
In the Court of Common Pleas of Lancaster County
Criminal Division at No(s): CP-36-CR-0001430-2015

BEFORE:  SHOGAN, MOULTON, and PLATT,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED MAY 11, 2017**

Appellant, Mathew Stefan Morales, appeals from the February 16, 2016 judgment of sentence entered in the Court of Common Pleas of Lancaster County following a jury trial.  We affirm.

In its opinion, the trial court presented the facts of the crime in an extensive fourteen-page summary of the evidence presented at trial.  ***See*** Trial Court Opinion, 9/2/16, at 2–15.  Briefly, testimony established that Manheim Township Police and Lancaster City Bureau of Police were dispatched at 3:20 a.m. on June 21, 2014, to the area of the 1100 block of Helen Avenue for a report by an individual on a cell phone reporting that he had been shot.  N.T., 2/8/16, 93–94, 114–115.  Manheim Township Officer

---

[*] Retired Senior Judge assigned to the Superior Court.

Kelly Spence testified that the victim, Xavier Garriga, was lying on his back and bleeding, with a cell phone in his hand, in the 800 block of New Holland Pike.[1]  *Id*. at 116–117.  Three spent shell casings and a spent .40 caliber bullet were also located and documented.  *Id*. at 167, 182–191.  The victim died of a "through-and-through" gunshot wound to the chest from a bullet that "went completely through the body, so there was no bullet within the body."  N.T., 2/11/16, at 542.  The Commonwealth presented an extensive and exhaustive case of circumstantial evidence against Appellant.  *See* Trial Court Opinion, 9/2/16, at 2–15.

At the conclusion of the four-day trial, the jury convicted Appellant on February 12, 2016, of first-degree murder, 18 Pa.C.S. § 2502(a).  Appellant waived a presentence investigation, and the trial court sentenced Appellant on February 16, 2016, to life imprisonment without the possibility of parole.  N.T., 2/12/16, at 8.  On February 17, 2016, Appellant filed a post-sentence motion requesting a new trial and asserting that the verdict was against the weight of the evidence.  Appellant filed a second post-sentence motion on February 24, 2016, contesting certain costs assessed against him.  While post-sentence motions were pending, Appellant filed a premature notice of

---

[1]  Police and the Lancaster-Wide Communications dispatch center utilized the pings from the cell phone to locate the victim.  N.T., 2/8/16, at 93–95, 115–117.

appeal on March 14, 2016, at Superior Court Docket Number 423 MDA 2016, which he withdrew the next day.

The trial court denied both post-sentence motions by separate orders on April 5, 2016. Appellant filed an untimely notice of appeal on May 9, 2016, docketed in this Court at 744 MDA 2016.[2] Apparently realizing his misstep, Appellant presented a Motion to Reinstate Appellate Rights *Nunc Pro Tunc* to the trial court.[3] On May 18, 2016, the trial court reinstated Appellant's right to appeal *nunc pro tunc*, and Appellant filed the instant notice of appeal on May 23, 2016. Both Appellant and the trial court complied with Pa.R.A.P. 1925.[4]

Appellant raises the following issues on appeal, which we have reordered for ease of disposition:

_____

[2] The appeal was marked "Discontinued" on June 27, 2016.

[3] The docket entries do not reveal the filing date of the motion, but it is attached to the trial court's order dated May 17, 2016, that was filed on May 18, 2016. There is no order quashing the appeal as untimely by this Court; indeed, the appeal at 744 MDA 2016 was not marked as "Discontinued" until June 27, 2016. Thus, on May 17, 2016, the trial court did not have jurisdiction to entertain Appellant's Motion to Reinstate Appellate Rights *Nunc Pro Tunc*. As noted *supra* in note 1, however, that appeal eventually was marked discontinued by this Court, and the trial court granted the *nunc pro tunc* right to appeal. Therefore, in the interest of judicial economy, we consider the appeal.

[4] On July 15, 2016, pursuant to Pa.R.A.P. 3517, this Court dismissed the instant appeal for Appellant's failure to file a docketing statement. In response to counsel's explanatory petition, we reinstated the appeal on August 3, 2016.

A. Whether the evid[e]nce presented at trial was insufficient to find defendant guilty of first degree murder.

B. Whether the trial court abused its discretion in concluding that jury's verdict was not against the weight of evidence presented at trial.

Appellant's Brief at 1 (full capitalization omitted).

We first address Appellant's argument regarding the sufficiency of the evidence. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. *Commonwealth v. Diamond*, 83 A.3d 119 (Pa. 2013). "[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." *Commonwealth v. Colon-Plaza*, 136 A.3d 521, 525–526 (Pa. Super. 2016) (quoting *Commonwealth v. Robertson-Dewar*, 829 A.2d 1207, 1211 (Pa. Super. 2003)). It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. *Commonwealth v. Tejada*, 107 A.3d 788, 792–793 (Pa. Super. 2015). The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. *Commonwealth v. Mucci*, 143 A.3d 399, 409 (Pa. Super. 2016). Moreover, as an appellate court, we may not re-weigh the evidence and

substitute our judgment for that of the fact-finder. ***Commonwealth v. Rogal***, 120 A.3d 994 (Pa. Super. 2015).

Beyond reference to two cases setting forth the above standards, Appellant's two-sentence sufficiency argument in his brief is vague and conclusory, and his claim is undeveloped. Appellant's Brief at 6. Appellant wholly fails to refer to any supporting case law. Appellant does not offer any reason for his claim of insufficient evidence, beyond his bald assertion that premeditation is lacking, and he does not espouse any recitation of how or why the trial court abused its discretion. Appellant's citation to seventy-eight pages of notes of testimony, without any explanation, is insufficient to support such a claim. ***Commonwealth v. Woodard***, 129 A.3d 480, 509 (Pa. 2015) (quoting ***Wirth v. Commonwealth***, 95 A.3d 822, 837 (Pa. 2013), which stated that "where an appellate brief fails to . . . develop an issue in any other meaningful fashion capable of review, that claim is waived. It is not the obligation of an appellate court to formulate [the] appellant's arguments for him.") (internal quotations omitted)). Therefore, we find the issue waived. However, even if the issue had been properly preserved, we would find it lacks merit based upon the trial court's extensive analysis in its Pa.R.A.P. 1925(a) opinion. Trial Court Opinion, 9/2/16, at 19–22.

Appellant also assails the weight of the evidence. "The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe

- 5 -

all, part, or none of the evidence and to determine the credibility of the witnesses." **Commonwealth v. Gonzalez**, 109 A.3d 711, 723 (Pa. Super. 2015). In **Commonwealth v. Clay**, 64 A.3d 1049 (Pa. 2013), our Supreme Court set forth the following standards to be employed in addressing challenges to the weight of the evidence:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. **Commonwealth v. Widmer**, 560 Pa. 308, 319, 744 A.2d 745, 751-[7]52 (2000); **Commonwealth v. Brown**, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. **Widmer**, 560 A.2d at 319–[3]20, 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" **Id**. at 320, 744 A.2d at 752 (citation omitted). It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." **Brown**, 538 Pa. at 435, 648 A.2d at 1189.

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

>> Appellate review of a weight claim **is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence***. **Brown**, 648 A.2d at 1189. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. **Commonwealth v. Farquharson**, 467

- 6 -

Pa. 50, 354 A.2d 545 (Pa. 1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Widmer*, 560 Pa. at 321–[3]22, 744 A.2d at 753 (emphasis added).

*Clay*, 64 A.3d at 1054–1055. "Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." ***Commonwealth v. Diggs***, 949 A.2d 873, 879–880 (Pa. 2008).

Appellant suggests that "no reasonable jury could conclude" that Commonwealth witness Luis Fuentes "was credible." Appellant's Brief at 5. Similarly, he avers that the jury could not have believed the testimony of forensic reconstructionist Sergeant Jeffrey Jones. *Id*. at 5–6. Finally, Appellant posits that in light of the testimony of forensic biologist Jennifer Sears, the jury could not have concluded Appellant fired the shot that killed the victim. The Commonwealth responds that the jury observed the witnesses and their demeanor and decided the weight, if any, to accord to their testimony. Commonwealth's Brief at 8. Moreover, all of the testimony cited by Appellant was corroborated by other evidence presented, including video, time-distance analysis, bullet-trajectory analysis, and the three shell casings found at the scene. *Id*.

In the case at bar, the jury was free to believe all, part, or none of the evidence against Appellant. *Gonzalez*, 109 A.3d at 723. It chose to believe

- 7 -

the evidence presented by the Commonwealth, as was its right. *Id*. Based upon our review of the record, we conclude this issue lacks merit; we rely on the thorough and detailed opinion of the Honorable Donald R. Totaro.[5] The court weighed all of the evidence, found that it supported the verdict, and determined that the jury's verdict was not so contrary to the evidence as to shock one's sense of justice. Trial Court Opinion, 9/2/16, at 15–19. This Court will not assume the role of fact-finder and reweigh the evidence. Accordingly, based on the trial court's opinion, we conclude that the trial court did not abuse its discretion in refusing to grant relief on Appellant's challenge to the weight of the evidence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/11/2017

---

[5] The parties are directed to attach the opinion in the event of future proceedings in this case.

# IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
## CRIMINAL

COMMONWEALTH OF PENNSYLVANIA,      :

       v.      :

MATHEW S. MORALES      :

833 MDA 2016

CP-36-CR-0001430-2015

## PA R.A.P. 1925 OPINION

BY TOTARO, J.

On February 8, 2016, Mathew S. Morales ("Appellant") appeared before the court for a jury trial on Information Number 1430-2015, for one count of Criminal Homicide (18 Pa.C.S.A. § 2501(a)). At the conclusion of a four-day jury trial, Appellant was found guilty of Murder of the First Degree (18 Pa.C.S.A. § 2502(a)). On February 16, 2016, Appellant was sentenced to a mandatory term of life imprisonment without the possibility of parole. *See* Sentencing Order.

On February 17, 2016, Appellant filed a Post-Sentence Motion alleging the jury's verdict was against the weight of the evidence presented at trial and was "so contrary to the evidence as to shock one's sense of justice." As such, Appellant asked the court to set aside the verdict and grant him a new trial. *Id.* On April 5, 2016, the Court issued an Order denying said Motion.[1]

On May 23, 2016, Appellant filed the instant Notice of Appeal to the Superior Court of Pennsylvania.[2] Thereafter, Appellant filed a timely Statement of Errors Complained of on

---

[1] Appellant filed a separate Post-Sentence Motion on February 24, 2016, contesting costs assessed against him at the time of sentencing for expenses incurred by a Commonwealth expert witness. The motion was denied on April 5, 2016, and Appellant has not raised that issue on appeal.

[2] On March 14, 2016, Appellant filed his first Notice of Appeal (423 MDA 2016) while the post-sentence motion was still pending. That appeal was withdrawn on March 15, 2016. On May 9, 2016, Appellant untimely filed his second Notice of Appeal (744 MDA 2016), more than 30 days after the post-sentence motion was decided. On May 18, 2016, Appellant's right to appeal was reinstated *nunc pro tunc*. On May 23, 2016, Appellant filed the pending Notice of Appeal (833 MDA 2016).

Appeal ("Statement") setting forth the following allegations of error: (1) the jury's verdict was against the weight of the evidence; and (2) there was insufficient evidence of intent for the jury to find Appellant guilty of Murder of the First Degree. *See* Statement. This opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure.[3]

## TESTIMONY

Officer Kelly Spence ("Spence") of the Manheim Township Police Department ("MTPD") testified that on June 21, 2014, she was working the 6 p.m. to 6 a.m. shift when she received a call at around 3:20 a.m. indicating a person was down in the 1100 block of Helen Avenue. (Notes of Transcript at 114-15) ("N.T."). Spence responded to the scene and began searching backyards, side streets and sidewalks for the person who was down. *Id* at 116. Spence then heard an officer say they found an individual laying on the sidewalk in the 800 block of New Holland Pike, Manheim Township, and she responded to that location. *Id.* at 116-17.

Upon arrival, Spence saw an individual, later identified as Xavier Garriga ("Garriga") laying on his back, bleeding, barely breathing, with a cell phone in his right hand. (N.T. at 117). While at the scene, Spence discovered a shell casing on the road near the fog line in the eastbound lane, which she marked by placing a wet piece of notebook paper on the road near the casing. *Id.* at 118-19. Two additional casings were found in the roadway and they were marked in a similar manner. *Id.* at 120. According to Spence, at least one shell casing appeared to have been run over. *Id.* at 124.

---

[3] The Notice of Appeal at 833 MDA 2016 established a deadline of July 22, 2016, for submission of the original record. However, on July 15, 2016, the Superior Court dismissed the appeal for failure of Appellant to comply with Pa. R.A.P. 3517. On August 3, 2016, Superior Court entered an order reinstating the appeal. On August 12, 2016, the trial court sent a letter to Superior Court requesting additional time for submission of the original record, for the reasons stated therein. *See* Letter.

2

Detective John Wettlaufer ("Wettlaufer"), of the MTPD, testified that he arrived on the scene at approximately 5:15 a.m. on June 21, 2014. (N.T. at 165-67). Upon arrival, Wettlaufer processed the scene and secured three shell casings that were found in the street.[4] Id. at 167, 182-89. Wettlaufer also documented a bottle of orange juice, a shopping bag, a blood-stained t-shirt, a container of nachos, a pool of blood, a baseball cap, and a sandwich in a Turkey Hill wrap. Id. at 167, 172-74. A Samsung cell phone was found near the hat and nachos. Id. at 194-95. When moving the blood-stained T-shirt, Wettlaufer found a spent bullet consistent with a .40 caliber class, on the edge of the sidewalk where the nachos were located. Id. at 175, 190-91.

Detective Brian Freysz ("Freysz") has been employed by MTPD since 2000, and has worked as a detective since 2005. (N.T. at 228). On June 21, 2014, Freysz was informed that officers had gone to the Turkey Hill store located at 806 New Holland Avenue, a short distance from the crime scene, and discovered there had been an altercation between two customers. Id. at 229-30. Freysz responded to the Turkey Hill to interview one of the clerks. Id. at 232.

That clerk, Angel Mateo-Viera ("Viera") testified at trial that on June 21, 2014, he was employed at the Turkey Hill on New Holland Avenue working the 11:00 p.m. to 7:00 a.m. shift as a cashier. (N.T. at 128-29). Viera recalled an argument that took place at roughly 3:00 a.m. between two men near the cash register inside the Turkey Hill. Id. at 129-30.

According to Viera, one of the men (later identified as Garriga) entered the store by himself and was there for a few minutes. (N.T. at 130-31). Five to ten minutes later, two other

---

[4] The first shell casing was found lying farthest from the crime scene. (N.T. at 184-85). The second shell casing was found in the northeast lane on New Holland Avenue. Id. at 187-88. The third casing was found on the center fog line of the road. Id. at 188-89. They all appeared to be damaged. Id. at 184-89. Wettlaufer explained that these bullets were fired from a semiautomatic gun. Id. at 186-87.

3

men arrived by vehicle, parked at a gas pump, and entered the Turkey Hill. *Id.* at 132-34. Viera identified one of those men as Appellant. *Id.* at 132-35. After they entered the store, Viera heard Garriga make a comment to Appellant about the gold necklace Appellant was wearing. *Id.* at 135-36. Appellant responded to Garriga in a sarcastic and macho manner, telling Garriga to mind his own business. *Id.* at 137-39. The two continued to exchange words, and the conversation escalated with both men raising their voices. *Id.* When Appellant told Garriga they could take it outside to settle it, Garriga obliged. *Id.* at 139-40. During the conversation between Garriga and Appellant, Viera observed that the third male was attempting to calm Appellant and get him to leave the store, telling Appellant it "wasn't worth it." *Id.* at 141-42. According to Viera, the third male never raised his voice, used profanity, made any threats, or displayed a weapon. *Id.* Eventually, Appellant and the third male left the store while Garriga remained inside to purchase nachos. *Id.* at 143-44, 157.

After Garriga left the store, Viera saw him and Appellant exchanging words in the parking lot. (N.T. at 144-45). The third male was not part of that exchange. *Id.* at 144-45. Garriga eventually walked away from Appellant, left the parking lot, and crossed the street. *Id.* at 145. Appellant returned to his car, pumped gas, and got into the driver's seat while the third male got into the right passenger side of the car. *Id.* at 146. Viera then saw Appellant drive out of the parking lot and make a right turn onto New Holland Avenue. *Id.* at 146-47. About one hour later, police officers arrived to ask Viera questions about what he had observed that night and to request the Turkey Hill surveillance video. *Id.* at 159.[5]

---

[5] The jury viewed a 28 minute surveillance video from the Turkey Hill which recorded the incident, while Viera narrating what was happening. (N.T. at 147-59); Commonwealth Exhibit #3.

4

Freysz further testified that on June 21, 2014, he recovered the Turkey Hill surveillance video and distributed images to the news media in an effort to identify the individuals in the video. (N.T. at 234-36). As a result, at approximately 9:00 p.m. on that same day, Appellant and Luis Fuentes ("Fuentes") went to the Lancaster City Bureau of Police ("LCBP") station to speak to officers regarding the Turkey Hill incident. *Id.* at 237-38. Thereafter, Appellant and Fuentes were transported as guests to the MTPD station to be interviewed. *Id.* at 238.[6]

At trial, Fuentes was called to testify as a witness. (N.T. at 337). According to Fuentes, he and Appellant grew up together and he had been to Appellant's house multiple times. *Id.* at 337-39, 378. Fuentes knew that Appellant kept a .45 caliber handgun, a .40 caliber gun, and ammunition in his house. *Id.* at 339. Additionally, he knew Appellant usually carried his .45 caliber and his .40 caliber guns on his person and in his Camry. *Id.* at 340-41.

Fuentes recalled for the jury the events of June 21, 2014. (N.T. at 341). He stated he was eating at McDonald's when Appellant called and asked if he wanted to accompany Appellant to "P's house." *Id.* Fuentes agreed to go and Appellant picked him up at McDonald's. *Id.* at 341-42. After leaving McDonald's, Appellant and Fuentes drove alone to Turkey Hill to purchase a Dutch Master cigar and gas. *Id.* at 342-43.

Upon arriving at Turkey Hill, Appellant parked by a gas pump. (N.T. at 343-44). Fuentes and Appellant walked into Turkey Hill, at which time Fuentes observed a customer, later identified as Garriga, standing in front of the cash register. *Id.* at 344-45. Fuentes stated Garriga

---

[6] Appellant's interview was recorded on a DVD by MTPD and published to the jury. (N.T. at 241-52); Commonwealth Exhibit #9. During the interview, Appellant admitted to being at the Turkey Hill but denied involvement in the shooting, claiming he simply told Garriga to "have a blessed day" when confronted by Garriga. (DVD: Statement of Appellant at 22:15:30 to 22:21:09). After the interview, police retrieved a water bottle used by Appellant for later DNA analysis. (N.T. at 299).

5

appeared to be drunk because of his speech and body movements. *Id.* at 346. Fuentes saw Garriga say something smart to Appellant and the two began to get loud with each other. *Id.* at 346-47. In reference to a gold necklace Appellant was wearing, Fuentes heard Garriga say "what's up with that chain?" *Id.* at 347-48, 384. According to Fuentes, Appellant became angry with Garriga, they were standing face-to-face, and Garriga challenged Appellant to a fight. *Id.* at 348-50, 385-86. Fuentes stated he never got involved in the argument, which lasted for five to ten minutes. *Id.* at 350. Rather, Fuentes tried to get Appellant to leave, but Appellant would not listen and remained in the store. *Id.* at 350-51.

Appellant and Garriga continued to argue inside the Turkey Hill as Fuentes returned to the car. (N.T. at 351-52). Appellant then left the store and went outside to put gas in his car. *Id.* at 352. Fuentes eventually went back into the store to purchase a cigar, and Appellant went back into the store after him for an unknown reason. *Id.* at 352-53. Garriga was still inside. *Id.* at 353. Fuentes then observed Appellant and Garriga arguing in the parking lot. *Id.* At this point, Fuentes was back in the car and he could hear their loud voices but could not understand what was being said. *Id.* at 353-54. After the argument ended, Garriga exited the parking lot on foot and turned right towards the railroad bridge. *Id.* at 354-56. Fuentes stated he saw Garriga carrying a store bag as he walked away. *Id.* at 387.

Shortly thereafter, Appellant returned to the car and drove out of the parking lot with Fuentes in the front passenger seat. (N.T. at 356). Appellant made a right turn and traveled east on New Holland Avenue towards the bridge. *Id.* at 356-57. According to Fuentes, who was admittedly "kind of drunk and high," Appellant then slowed down as he approached the bridge, put the driver's window down, and Fuentes heard three shots. *Id.* at 357-58, 389. Fuentes stated

6

he did not see what Appellant was shooting at, but he heard three shots being fired and heard shell casings hitting the windshield. *Id.* at 358-61. After the shots were fired Appellant began to drive faster, and as Fuentes looked to his left he saw a bag fall on the sidewalk. *Id.* Fuentes also saw Appellant holding a black .40 caliber gun in his right hand after the shooting. *Id.* at 360. Fuentes stated he saw Appellant with the gun about two weeks prior to this incident at a church basketball game, when Appellant told Fuentes he needed to buy the gun because his other gun had been stolen from his car. *Id.* at 361-62.

After the shooting, Appellant drove for approximately 20 minutes on New Holland Avenue until they got to P's house, where they stayed for 10 to 15 minutes. (N.T. at 363). After they left P's house, Appellant drove back towards Lancaster city on New Holland Avenue, but made a U-turn down a back road once they approached the crime scene and saw police lights. *Id.* at 363-64. Fuentes stated he and Appellant did not speak about the shooting until they saw the police lights, and at that point Appellant indicated the cops might question them because they were at the Turkey Hill. *Id.* at 363, 393-96. Appellant then dropped Fuentes off at a friend's house in the city. *Id.* at 364-65, 396.

Later that morning, Fuentes saw on the news that Garriga had died. (N.T. at 365). When Fuentes saw a picture of Appellant and himself on the news that afternoon, he called Appellant. *Id.* at 365-66. Appellant told Fuentes they had to "stick to the same story," and tell the police they went straight from Turkey Hill to P's house and did not argue with anyone. *Id.* at 367. Fuentes and Appellant then went to the police station to be interviewed. *Id.* at 367-68.[7]

---

[7] At trial, Fuentes admitted he lied on June 21, 2014, when he told police he and Appellant did not see Garriga after they left Turkey Hill, he had never seen Appellant with a gun, and he knew nothing about the shooting, because he was the only witness and he was afraid of Appellant. (N.T. at 370-71).

On June 22, 2014, Wettlaufer assisted in searching Appellant's vehicle, a 2005 silver Toyota Camry. (N.T. at 200). According to Wettlaufer, the car was pretty clean and looked as if the carpet mats had recently been vacuumed. *Id.* at 201. No weapons or ammunition were recovered. *Id.* at 200. Wettlaufer collected gunshot residue ("GSR") samples from different areas of the car using collection kits, including the inside left front door, steering wheel, top of the dashboard on the left side of the vehicle, left side of the front seat, inside of the right front door, outside of the right roof, right side of the top dashboard, and right side of the front seat. *Id.* at 201-04. Each kit was sealed separately and sent to RJ Lee laboratory. *Id.* at 204, 298.

Allison Laneve ("Laneve"), a forensic scientist at the RJ Lee Group who conducts primer GSR analysis, performed a GSR analysis of the eight GSR samples obtained from Appellant's car. (N.T. at 463-64, 475-77). Laneve explained there were four total particles found in the interior of the car, two on each side, which are highly specific to the discharge of a firearm. *Id.* at 478-81, 500-01. Although she could not give an opinion as to how the GSR came to be in Appellant's vehicle, or how long it was there, Laneve testified that GSR might be found in a vehicle if someone discharged a gun on it, near it, or within it, or if something with gunshot residue on it came into contact with the vehicle. *Id.* at 483-84, 491-92.

---

Fuentes admitted he lied to police during a second interview on August 7, 2014, when he again stated he had no knowledge of what happened to Garriga, because Appellant was still out on the street and Fuentes was scared. (N.T. at 371-72).

However, on April 29, 2015, after Fuentes was arrested and incarcerated twice on unrelated gun charges, he gave a third statement to police where he identified Appellant as the person that shot Garriga and admitted he lied in his previous statements. (N.T. at 308-13, 372-76). Fuentes stated he was not promised a break on his pending gun charges, but admitted he was hopeful his testimony would result in a more lenient sentence. *Id.* at 376, 412-13. Christopher Tallarico, Fuentes' attorney, also testified that no offers had been extended to Fuentes. *Id.* at 426. In explaining why he was now implicating Appellant in the shooting, Fuentes stated: "[b]ecause I knew I was lying and I couldn't sleep at night, and I just felt I was doing the right thing." *Id.* at 376.

8

On June 27, 2014, police executed a search warrant at Appellant's residence. (N.T. at 268). Among the items found were a pistol box for a Glock semiautomatic pistol, a loaded .45 caliber magazine and unloaded .40 caliber magazines, a thigh holster and two belt holsters that could hold a .45 caliber or Glock .40 caliber gun, an envelope containing two test-fired rounds for Appellant's Glock .40 caliber gun (sent to Pennsylvania State Police ballistics lab), a gun case for a pistol, a membership card to a shooting range, certification that Appellant was qualified to shoot at the range, and a silhouette target with multiple bullet holes. *Id.* at 268-85. Police also found a loaded AK 47 machine gun between the mattress and box spring in Appellant's bedroom and a loaded Mossberg 500 in the living room behind the cushion of a couch. *Id.* at 275-76.[8]

At trial, counsel stipulated to the ballistics analysis performed in this case (N.T. at 501-03). According to Darren Mortorf, a firearms and tool mark examiner at the Pennsylvania State Police Harrisburg Regional Laboratory: (1) the three discharged casings found at the crime scene, identified as Commonwealth Exhibits 5-A, 5-B, and 5-C, were discharged from the same unknown firearm;[9] (2) the two test-fired casings recovered from Appellant's home, identified as Commonwealth Exhibit 10, were discharged from the same unknown firearm; (3) a definite

---

[8] Freysz obtained records showing that Appellant had purchased an AK 47 and a Glock .40 caliber on March 8, 2012. (N.T. at 255). Appellant did have a concealed carry permit, and the AK 47 was legally purchased. *Id.* at 272, 329. Appellant informed detectives during his interview that the .40 caliber gun was stolen, and Freysz confirmed a stolen gun report had been filed on May 19, 2014. *Id.* at 256-57.

[9] After the ballistics analysis, Jennifer Sears ("Sears"), a forensic biologist with NMS Labs, testified she received three spent cartridge casings, a known DNA sample from Appellant, and a known DNA sample from Fuentes. (N.T. at 447-50). She testified that the first and third casings did not produce a DNA profile, while the second casing produced a partial DNA profile which excluded Appellant and Fuentes as the source. *Id.* at 451-53. Sears explained how it is possible to touch an item without leaving an identifiable DNA profile, particularly spent shell casings which are often difficult to work with because of the surface area and exposure to heat during the firing process. *Id.* at 453-56.

9

determination could not be made as to whether Commonwealth Exhibits 5-A through C and Exhibit 10 were discharged from the same firearm; (4) Commonwealth Exhibits 5-A through C and Exhibit 10 could have been discharged within a firearm manufactured or marketed by Glock and Smith & Wesson Sigma; and (5) Commonwealth Exhibit 6, the discharged and mutilated metal jacketed bullet found at the crime scene, was of the .40 caliber class and it could have been discharged from a firearm manufactured by Glock. *Id.* at 503-06.

As part of the investigation, Appellant consented to an extraction on his cell phone, and arrangements were made to pick up his phone the following Monday. (N.T. at 289, 318-19). However, Freysz testified that when the phone was turned over by Appellant there appeared to be blocks of information missing from the cell phone when they did the extraction. *Id.* at 289. Nevertheless, the records they were able to obtain were provided to Detective Steve Owens ("Owens") of LCPD, who was asked to plot Appellant's cell phone records to identify Appellant's location prior to, during, and after Garriga was shot. *Id.* at 290.

Owens testified that in 2007, he began specializing in cell phone technology to assist investigators in determining calls, call duration, and types of usage of cell phones. (N.T. at 506-07). Owens explained he also uses reports generated by cell phone providers to determine the general location of the phone when a call is made. *Id.* at 507-08. In the present case, Owens was asked to look at a set of cell phone records provided by AT&T for Appellant's cell phone activity on June 21, 2014, to determine whether calls were made, to identify the location of the specific cell phone towers used at the beginning and end of each call or data usage, and to provide the general location of Appellant and his cell phone when those phone calls were made or data was used. *Id.* at 508-18.

10

Records showed that on June 21, 2014, Appellant received an incoming telephone call at 3:19 a.m. using a tower sitting almost right on top of Turkey Hill, indicating Appellant's phone was very close to that Turkey Hill. (N.T. at 519-21). At 3:27 a.m., there was an outgoing telephone call made from Appellant's cell phone which used a tower in another sector that showed Appellant was moving from west to east. *Id.* At 3:40 a.m., AT&T used their Network Event Location System ("NELOS"), which is a way of tracking where a cell phone is located, to determine Appellant was in the area of New Holland. *Id.* at 521-23. Owens stated that this data indicated Appellant's phone was moving eastbound along New Holland Avenue (Route 23) from the Turkey Hill to New Holland between 3:19 a.m. and 3:43 a.m. *Id.* at 524.

Owens further testified that at 3:43 a.m., there was an incoming call and a NELOS hit, as well as another NELOS hit at 3:58 a.m, which showed the movement of Appellant's cell phone back towards Lancaster along Route 23. (N.T. at 524). At 4:05 a.m., the cell phone was again moving westbound on Route 23. *Id.* at 524-25. Phone calls at 4:13 a.m., 4:18 a.m., and 4:19 a.m., also showed continued movement from east to west. *Id.* at 525. Owens noted that between 3:43 a.m. and 4:19 a.m., records showed Appellant was traveling westbound from New Holland to Lancaster City following Route 23. *Id.* at 526.[10] From the 4:19 a.m. call until 11:33 a.m., all phone activity used the same tower which was located in the same sector as Appellant's residence, and a NELOS hit at 6:01 a.m. was directly adjacent to his residence. *Id.* at 525-26.

At trial Freysz identified the victim as Garriga, who lived approximately 3/4 of a mile from where he was shot, in the direction where he was walking. (N.T. at 230-32). On June 23,

---

[10] During his interview, Appellant claimed that when he and Fuentes returned from New Holland to Lancaster City they did not travel on Route 23, and thus did not see police activity on Route 23 near Turkey Hill. Commonwealth Exhibit #9 (DVD: Statement of Appellant at 22:27:06 to 22:27:40).

11

2014, Dr. Wayne K. Ross, M.D. ("Ross"), a forensic pathologist, performed an autopsy on

Garriga's body. *Id.* at 534-38.[11] Ross observed abrasions on Garriga's hand, elbow, and wrist, as

well as a gunshot wound. *Id.* at 540. The bullet entered Garriga's right shoulder at a height of

58½ inches, broke his arm, reentered the right side of his chest, went through his right lung,

completely through his spine slicing it in half, through the left lung, and exited out of his left

armpit region at 55 inches from Garriga's left heel. *Id.* at 541. Ross did not recover a bullet. *Id.*

at 542. The gunshot wound traveled from the right to left side, slightly front to back, and in a

slight downward motion. *Id.* at 543-44.

As a result of this fatal gunshot wound, Garriga had bleeding in both of his lungs and he

was paralyzed such that his legs immediately gave out and he dropped straight to the ground.

(N.T. at 541-42). However, the wound was not instantly fatal and Garriga was still able to use

his arms until he bled out. *Id.* at 542, 545. Ross opined to a reasonable degree of medical

certainty that Garriga's cause of death was a gunshot wound to the chest, and the manner of death

was homicide. *Id.* at 545-46. Moreover, Garriga's recent abrasions were consistent with scrapes

from a fall. *Id.* at 546.[12] Ross further opined that the range of fire was from at least three to four

feet away or greater, because there was no evidence of soot or gunshot residue found on

Garriga's body and the gunshot hole was only one-half by one-half inch, which is indicative of a

distant gunshot wound. *Id.* at 543.

---

[11] According to Freysz, who was present at the autopsy, $160 in U.S. currency and a sandwich bag of cocaine were found on Garriga. (N.T. at 257-60). Freysz explained the bag contained a little over three grams of cocaine. *Id.* at 260-61. Freysz did not uncover any evidence indicating that Garriga was involved in dealing drugs or that the shooting was drug related. *Id.* at 261, 322-28, 333-34.

[12] Ross performed a toxicological analysis as part of the autopsy, which revealed alcohol in Garriga's bloodstream and a blood alcohol concentration of .06 percent. (N.T. at 547).

12

During trial, Wettlaufer testified that on June 21, 2014, in addition to the items he found at the crime scene which he previously identified for the jury, he located a fresh mark in the brick mortar of the wall of a building at 851 New Holland Avenue. (N.T. at 176-77). According to Wettlaufer, this was indicative of a fresh bullet strike. *Id.* He found a fresh strike on a branch that was less than a foot away from the brick mortar. *Id.* Wettlaufer found a third impact strike on a second branch closer to the front of the bush. *Id.* at 179-80. Wettlaufer then found a disintegrated fragment of copper jacketing from a bullet on the ground below the strike on the wall. *Id.* at 177, 192-93.

Wettlaufer, who is trained in trajectory involving damage to physical objects such as walls, conducted a process called trajectory rod lining, which involved finding at least two points and lining up an aluminum rod between the points to deduce the direction the bullet would have traveled once it left the barrel of the gun. (N.T. at 178-79). In this case, Wettlaufer lined up the aluminum rod between the strike in the brick mortar, the strike in the branch near the brick mortar, and the strike in the branch near the front of the bush. *Id.* at 178-82. He took measurements of permanent objects at the scene, including a fire hydrant and PP&L pole. *Id.* at 196-97. Wettlaufer then measured the bullet strikes and the distance from the fire hydrant and the curb to each item found at the scene so he could triangulate the items. *Id.* at 197-99. These measurements were sent to another officer for analysis. *Id.* at 197.

On August 27, 2014, detectives returned to the scene with an exemplar vehicle that was the same year, make, and model as Appellant's vehicle, to see if the trajectory would be consistent with a vehicle on the road or a person standing in the road. (N.T. at 206-07). The trajectory was done by pulling fluorescent string from various places on the car to the location

13

where a bullet impacted the bush and brick wall. *Id.* at 208-10. Wettlaufer testified that based on the measurements and analyses performed, the results were consistent with a bullet being fired from the driver's front window or the left rear window of Appellant's eastbound vehicle. *Id.* at 208-12.[13]

Furthermore, according to testimony from Freysz, two nearby businesses, Tommy's Auto and ECORE, had surveillance cameras facing New Holland Avenue on June 21, 2014. (N.T. at 264-65). Those videos, which were reviewed and found to contain footage relevant to the investigation, were given to Sergeant Jeffrey Jones ("Jones"), a certified crash reconstructionist employed by MTPD, who was asked to review the surveillance videos in order to reconstruct the incident and document the timing of vehicles on New Holland Avenue. *Id.* at 264-66, 304-05.

Jones testified he has been employed by MTPD for 31 years, where he focuses primarily on accident reconstruction and commands the Lancaster County Major Crash Investigation Unit. (N.T. at 549-51). Additionally, Jones runs his own business doing accident reconstruction for personal injury cases. *Id.* at 552. In the present case, Jones synched together surveillance videos from Turkey Hill, Tommy's Auto, and ECORE, which collectively showed the entrance of the bridge that crosses over New Holland Avenue, New Holland Avenue, and the corner of New Holland Avenue and Fountain Avenue. *Id.* at 561-69. Jones then prepared a PowerPoint to illustrate for the jury his analysis in this case. *Id.* at 569-71; Commonwealth's Exhibit 18.

According to Jones, the bullet that struck and killed Garriga was fired from Appellant's vehicle. (N.T. at 600). Jones testified that the videos showed Appellant accelerating his vehicle

---

[13] Wettlaufer stated there was a margin of error in using string for trajectory analysis, but string was used in this case because a laser pointer would not have been visible due to daylight conditions. (N.T. at 209, 226).

14

when he exited the Turkey Hill parking lot, he slowed down at the location where the shots were fired, and Appellant then accelerated in order to reach the camera from Tommy's Auto in the calculated time. *Id.* at 599-600. Jones opined that Appellant's vehicle was the only vehicle to match the timing of Garriga's walking, the 911 call, and Garriga's subsequent death. *Id.* at 600.[14]

## DISCUSSION

### I. The Jury's Verdict Was Not Against the Weight of the Evidence

In his Statement, Appellant alleges the jury verdict was against the weight of the evidence because testimony of the Commonwealth's key witness, Luis Fuentes, was so self-serving and contradictory to his prior statements to police that no reasonable jury could have found his testimony to be credible. *See* Statement. Additionally, the DNA evidence, gunshot residue

---

[14] Jones testified that he used the Turkey Hill video to determine Garriga's walking speed prior to the shooting. (N.T. at 579-81). By finding it took Garriga 21 seconds to walk 75 feet from where he started walking until he disappeared from view, Jones determined Garriga was walking at 3.5714 feet per second. *Id.* Jones then measured how long it would take for Appellant's vehicle to get from the exit of the Turkey Hill parking lot to where Garriga's body was found, traveling at the posted 35 mile per hour speed limit. *Id.* at 586-88. Using an exemplar vehicle with the same engine and transmission, the result was 12.23 seconds. *Id.* Noting that Appellant's vehicle did not leave the Turkey Hill parking lot until 136 seconds after Garriga took his first step, Jones determined it took Appellant's vehicle 148.23 seconds to arrive at the location where Garriga's body was found. *Id.* at 584-585, 588. Using Garriga's walking speed of 3.5714 feet per second, Jones determined that Garriga could walk 529.37 feet in 148.23 seconds. *Id.* at 588-89. In fact, the actual distance Garriga walked until he was shot was 535.87 feet, only 6.49 feet more than that projected by Jones at the time Appellant arrived at the location. *Id.* at 589.

Jones ruled out a light-colored SUV seen in a video traveling west on New Holland Avenue (N.T. at 593-96). He also examined seven other vehicles seen passing between the Turkey Hill and Tommy's Auto cameras during the time in question. *Id.* at 597-98. By using these cameras, Jones could determine how long it took for each car to go from point A to point B, the average speed for each vehicle as they passed between those two points, and whether they could have been at the shooting scene when Garriga was shot. *Id.* As a result, Jones determined it took Appellant 26 seconds to travel between the two points, while it took the other six vehicles 15, 16, 16, 11, 16, and 12 seconds respectively. *Id.* at 598-99. The average speed for Appellant's vehicle between these two points was 17.92 mph, in a 35 mile per hour zone, while the average speed for the six other vehicles was 31.07 mph, 29.13 mph, 29.13 mph, 42.37 mph, 29.13 mph, 38.84 mph. *Id.* at 599. This slower speed allowed Appellant to reach Garriga in his timed walk, shoot Garriga, accelerate, and reach Tommy's camera in the calculated time. *Id.* at 600.

15

evidence, time-distance analysis, and trajectory analysis, taken as a whole, were more indicative of Appellant's innocence than his guilt. *Id.*

An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court, and the trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Lyons*, 71 A.3d 1053, 1067 (Pa. 2013) (citations omitted). "Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror." *Commonwealth v. Widmer*, 744 A.2d 745, 752 (Pa. 2000). A trial court's exercise of discretion in finding that a verdict is or is not against the weight of the evidence is one of the "least assailable reasons for granting or denying a new trial." *Commonwealth v. Dupre*, 866 A.2d 1089, 1102 (Pa. Super. 2005) (citing *Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000)).

For a defendant to prevail on a challenge to the weight of the evidence, "the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Talbert*, 129 A.3d 536, 546 (Pa. Super. 2015) (quoting *Commonwealth v. Sullivan*, 820 A.2d 795, 806 (Pa. Super. 2003)). In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. *Commonwealth v. Smith*, 985 A.2d 886, 897 (Pa. 2009).

"The trial judge may not grant relief based merely 'on some conflict in testimony or because the judge would reach a different conclusion on the same facts.'" *Commonwealth v. Sanchez*, 36 A.3d 24, 27 (Pa. 2012) (quoting *Commonwealth v. Blakeney*, 946 A.2d 645, 653 (Pa. 2008)). The finder of fact is free to believe "all, part, or none of the evidence and to determine

16

the credibility of the witnesses." *Smith*, 985 A.2d at 897 (citing *Commonwealth v. Diggs*, 949 A.2d 873, 879 (Pa. 2008)). Questions concerning inconsistent testimony go to the credibility of the witnesses, and it is solely for the finder of fact to resolve any conflicts or inconsistencies in the evidence. *Commonwealth v. Lewis*, 911 A.2d 558, 566 (Pa. Super. 2006); *Commonwealth v. Upshur*, 764 A.2d 69, 74 (Pa. Super. 2000).

In *Upshur, supra*, the appellant claimed the jury's verdict finding him guilty of murder of the first degree was against the weight of the evidence because the only eyewitness to the crime had given conflicting accounts of the incident in statements to the police and during trial, which made his testimony "wholly unworthy of belief." 764 A.2d at 72. In support of this argument, the appellant pointed to inconsistencies in the record regarding the eyewitness accounts and descriptions of the assailant. *Id.* On appeal, the Superior Court stated it was solely for the jury to determine credibility of the witnesses, and to resolve conflicts or inconsistencies in the evidence. *Id.* at 74. Thus, the Superior Court concluded the verdict was not against the weight of the evidence presented at trial because the jury determined the testimony of the Commonwealth witness was credible. *Id.*

In *Ferguson, supra*, the appellant claimed the weight of the evidence did not support his robbery convictions because "certain DNA evidence recovered by police did not match [his] DNA," and no evidence proved that a gun recovered by police and belonging to appellant was the one used in the commission of the crime. 107 A.3d at 212. On appeal, the Superior Court noted the jury was free to believe all, part, or none of the evidence, and determine the weight the evidence was to be given. *Id.* at 212-13. The Superior Court found no abuse of discretion and affirmed the appellant's convictions. *Id.* at 213.

17

Presently, Appellant claims that Fuentes could not be found to be a credible witness. However, pursuant to *Upshur* and *Ferguson*, it was solely up to the jury to decide whether to believe the testimony of Fuentes, and the amount of weight it deserved. Further, the testimony of Fuentes was corroborated by other evidence Appellant asserts was exculpatory, and the jury was within its power to determine how much weight to give that evidence. Although DNA evidence was inconclusive, gunshot residue was found in Appellant's car. The trajectory analysis put the shooter in the vicinity of where Appellant's vehicle was located when Fuentes heard Appellant fire the shots. The time-distance analysis demonstrated that Appellant was traveling much slower than the six other identified vehicles in the vicinity where Garriga was shot, and Appellant's car would have been at the location of the shooting at the time of the incident.

Additionally, there was other evidence corroborating the testimony of Fuentes not referenced by Appellant in his Statement. Testimony from the Turkey Hill clerk and video from the store established that Appellant had an angry confrontation with Garriga shortly before the shooting, where Appellant was acting macho and offered to fight Garriga. This testimony from the clerk contradicted the statement given by Appellant to police, where Appellant claimed he simply told Garriga to have a blessed day. Three shell casings were found in the roadway at the scene of the shooting, consistent with the three shots heard by Fuentes. Evidence found at Appellant's house showed he was at one time in possession of a .40 caliber Glock, which ballistics showed could have been the murder weapon. Furthermore, Appellant's cellular telephone records confirmed the testimony of Fuentes that he and Appellant returned to Lancaster City from New Holland on Route 23 until they saw police activity. The records also refuted the statement given by Appellant to police that they took a different route.

18

In the present case, the jury's verdict was not so contrary to the evidence as to shock one's sense of justice, nor was it against the weight of the evidence. Therefore, Appellant's claim in this regard is without merit.

## II. There was Sufficient Evidence of Intent for the Jury to Find Appellant Guilty of Murder of the First Degree

Appellant also claims there was insufficient evidence of intent for the jury to find him guilty of murder of the first degree. *See* Statement. Appellant states that even if all of the evidence presented by the Commonwealth was to be believed and taken in a light most favorable to the Commonwealth, there was no evidence of premeditation or intent to kill because Appellant made no statements of intent, the lethal shot was not inflicted on a vital part of the human body, and there is no evidence that Appellant specifically aimed his weapon at the victim. *Id.* Thus, Appellant's actions demonstrated, at worst, a depraved indifference to the value of human life and the jury's verdict should have been guilty of murder of the third degree. *Id.*

To preserve a sufficiency of the evidence claim, a 1925(b) Statement must specify the element or elements on which the evidence was insufficient. *Commonwealth v. Melvin*, 103 A.3d 1, 42 (Pa. Super. 2014) (quoting *Commonwealth v. Williams*, 959 A.2d 1252, 1257 (Pa. Super. 2008)). In his Statement, Appellant satisfies this requirement by claiming there was no evidence of premeditation or intent to kill. *See* Statement.

A challenge to the sufficiency of the evidence is a question of law. *Commonwealth v. Heater*, 899 A.2d 1126, 1131 (Pa. Super. 2006). When reviewing a sufficiency of the evidence claim, appellate courts are governed by the following principles:

> [The] standard [for] reviewing sufficiency of the evidence is whether the evidence
> at trial, and all reasonable inferences derived therefrom, when viewed in the light

19

most favorable to the Commonwealth as verdict winner, are sufficient to establish all elements of the offense beyond a reasonable doubt. [The Court] may not weigh the evidence, or substitute [its] judgment for that of the fact-finder. Additionally, the evidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. When evaluating the credibility and weight of the evidence, the fact-finder is free to believe all, part, or none of the evidence. For purposes of [the Court's] review under these principles, [the Court] must review the entire record and consider all of the evidence introduced.

*Commonwealth v. Love*, 896 A.2d 1277, 1283 (Pa. Super. 2006) (internal quotations and citations omitted). The Commonwealth may sustain its burden of proof wholly by circumstantial evidence, as long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. *Commonwealth v. Estepp*, 17 A.3d 939, 943 (Pa. Super. 2011); *Commonwealth v. Lee*, 956 A.2d 1024, 1027 (Pa. Super. 2008).

To find a person guilty of murder of the first degree, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. *Commonwealth v. Johnson*, 985 A.2d 915, 920 (Pa. 2009) (quoting *Commonwealth v. Baumhammers*, 960 A.2d 59, 68 (Pa. 2008)); 18 Pa.C.S.A. § 2502(a). An intentional killing is a "killing by means of poison or by lying in wait, or any other kind of willful, deliberate, and premeditated killing." *Commonwealth v. Hitcho*, 123 A.3d 731, 746 (Pa. 2015) (quoting 18 Pa.C.S.A § 2502(d)). "[T]he period of reflection required for premeditation to establish the specific intent to kill 'may be very brief; in fact the design to kill can be formulated in a fraction of a second. Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death.'" *Commonwealth v. Rivera*, 983 A.2d 1211, 1220 (Pa. 2009) (internal quotations and citations omitted).

20

A specific intent to kill may be proven through circumstantial evidence. *Johnson*, 985 A.2d at 920 (quoting *Baumhammers*, 960 A.2d 68). Furthermore, specific intent to kill may be inferred from the accused's use of a deadly weapon on a vital part of the victim's body. *Rivera*, 983 A.2d at 1220. In *Commonwealth v. Talbert*, 129 A.3d 536 (Pa. Super. 2015), where the appellant claimed there was insufficient evidence to sustain a conviction of murder of the first degree, the Superior Court held that lungs are considered a vital part of the body. *Id.* at 543.

In *Commonwealth v. Washington*, 927 A.2d 586 (Pa. 2007), the appellant argued that there was insufficient evidence to sustain a conviction of murder of the first degree because he merely aimed in the victim's direction, which could not "rationally support an inference that he had the specific intent to kill; rather, the evidence is equally consistent with the probability that [he] sought only to scare or wound" the victim. *Id.* at 607. The Superior Court found that the appellant's claim had no merit, specifically rejecting the proposition that it had to find an appellant intentionally aimed at a vital part of the victim's body before it could find sufficient evidence to support an inference of the specific intent to kill. *Id.* Rather, the Superior Court held that in determining whether the evidence is sufficient to support an inference of the specific intent to kill, "the critical inquiry is the *use* of a deadly weapon on a vital part of the body, not the intentional aiming of the weapon at a vital part of the body." *Id.* (emphasis in original) (internal quotations and citations omitted).

In the case *sub judice*, evidence introduced at trial and all reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner, was sufficient to prove beyond a reasonable doubt that Appellant acted with premeditation and an intent to kill. Appellant was involved in an angry confrontation with Garriga at Turkey Hill,

21

offering to take it outside so they could fight. Shortly thereafter, Appellant fired his gun three times at Garriga, inflicting a single gunshot wound. The act of firing a total of three shots at the victim, by a sportsman who had knowledge of guns and belonged to a club where he took target practice, demonstrated more than an intent to scare the victim.

Additionally, the bullet fired by Appellant went through Garriga's right lung, completely through his spine, and then through the left lung. As the Superior Court concluded in *Talbert*, because the lung is a vital part of the body, a specific intent to kill may be inferred. Additionally, as the Superior Court established in *Washington*, it makes no difference whether Appellant intentionally aimed for Garriga's lung when he fired the gun, since he used a deadly weapon on a vital part of the body.

The evidence presented in this case by the Commonwealth, and all reasonable inferences derived therefrom, was sufficient to establish all elements of the offense of murder of the first degree beyond a reasonable doubt. Therefore, Appellant's claim in this regard must fail.

## CONCLUSION

Based on the foregoing, the jury's verdict finding Appellant guilty of murder of the first degree was not against the weight of the evidence and it was supported by sufficient evidence. Therefore, this appeal should be denied.

BY THE COURT:

_____
DONALD R. TOTARO, JUDGE

___September 2, 2016___
Date

I certify this document to be filed in the Lancaster County Office of the Clerk of the Courts.

Jacquelyn E. Pfursich
Clerk of Courts